# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR A CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Task Force Officer Rafael Duran, hereby state as follows:

## Introduction and Agent Background

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been assigned to the DEA since October 2024. I am currently assigned to the Boston Office of the New England Field Division. Prior to being assigned as a Task Force Officer, I completed 24 weeks of training at the Massachusetts State Police Academy, located in New Braintree, Massachusetts. My training included classroom preparation regarding drug trafficking networks, drug identification, as well as practical application of surveillance, drug investigation, and arrest procedures. Previously, I was a Police Officer for the Lawrence Police Department from January 2020 to January 2023. In August 2023, I transferred to the Massachusetts State Police and have held my current position since October 2024.

3. As a DEA Task Force Officer, I am authorized to investigate violations of the laws of the United States, including violations of federal drug laws (for example, 21 U.S.C. §§ 841 and 846). My current duties and responsibilities include the investigation of federal crimes, including violations of the statutes referenced above.

4. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents and cooperating sources, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics

trafficking organizations. I am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records.

5. Through my training and experience, I have become familiar with how illegal drugs are imported, transported, stored, and distributed, as well as with the methods of payment for such drugs. I have also become familiar with how narcotics organizations use various forms of violence and intimidation to further their narcotics trafficking activities and to protect their operations, members, drugs, and drug proceeds. I am aware that those who distribute controlled substances often use cryptic, coded or otherwise indirect language when telephonically discussing their illegal activities. I am aware also that those who distribute controlled substances will often add adulterants or additives to their controlled substances to increase the bulk of their distributable product, thereby increasing profit.

6. Based on my training and experience, I am aware that narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers.

**Purpose of the Affidavit**

7. I submit this affidavit in support of an application for a criminal complaint charging that [redacted] Darwin Alexander MEDINA ABREU, and Abraham DIAZ-MOURE (collectively, the "Target Subjects"), starting at least in or about March 2026, through in or about September 2026, conspired with each other and with others known and unknown to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846 (the "Charged Offense"). In addition to the Charged Offense, I am also investigating the Target Subjects for violations of Title 21, United States Code, Section 841

(distribution of and possession with intent to distribute controlled substances) (collectively, the "Target Offenses").

8. I also submit this affidavit in support of an application for a search warrant for the following premises (the "Target Location") and the cellular phones located therein for evidence, fruits, and instrumentalities of the Target Offenses, described more fully in Attachment B:

a. Target Location: 202 High Street, Apartment 3, Lawrence, Massachusetts. The Target Location is further described in Attachment A-1. The address of 202 High Street contains three apartments, the Target Location (Apartment 3) is located on the third floor and is accessed through a door on the right side of the front porch, labeled "202." As described below, investigators believe the Target Location is DIAZ-MOURE's residence.

9. I also submit this affidavit in support of an application for a search warrant for the person of Abraham DIAZ-MOURE for evidence, fruits, and instrumentalities of the Target Offenses, described more fully in Attachment B.

a. DIAZ-MOURE: The person of Abraham DIAZ-MOURE, YOB: 1992. There is probable cause to believe that the person of DIAZ-MOURE holds fruits, instrumentalities, and evidence of the Target Offenses. DIAZ-MOURE is described in more detail in Attachment A-2.

10. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports from other agents and task force officers of the DEA and other federal, state, and local law enforcement agencies. This affidavit is submitted for the limited purpose of establishing probable cause to obtain the requested criminal complaint and search warrants. Accordingly, I have not included each and every fact known to me and other investigators involved in this investigation. I have set forth only the facts that I believe are needed to establish probable cause for the requested criminal complaint and search warrants.

## Probable Cause

*Investigation Background*

11. In January 2026, investigators from the DEA and the Lawrence Police Department began investigating the drug trafficking activities of Co-Conspirator 1[1] in response to information received from a Confidential Source (the "CS").[2]

12. In January 2026, the CS informed investigators that Co-Conspirator 1 distributes fentanyl in the Lawrence, Massachusetts area and currently lives in the Dominican Republic. Specifically, the CS explained that Co-Conspirator 1 distributes large quantities of fentanyl pills and organizes his transactions via WhatsApp.

13. In March 2026, the CS organized a WhatsApp video call introducing Co-Conspirator 1 and an undercover law enforcement officer (the "UC"). In lightly coded language, Co-Conspirator 1 agreed to sell the UC fentanyl pills for $2.25 per pill. Co-Conspirator 1 described how the drug deal would work. Co-Conspirator 1 noted that an individual (the "Carrier") would arrive in the area of the planned drug deal with the fentanyl pills. Another DTO member would then pick up the pills from the Carrier to deliver them to the UC. Following the deal, the DTO member would bring the cash to the Carrier, who would depart from the area.

14. On March 23, 2026, the UC and Co-Conspirator-1, utilizing another DTO member as described above and a Carrier, completed a transaction for 500 pills, or approximately 54 grams

---

[1] Investigators believe they have identified Co-Conspirator 1. I am withholding his name from this affidavit because he is not being charged in the requested criminal complaint.

[2] The CS has been cooperating with law enforcement since 2023 and is cooperating in exchange for possible charging or sentencing consideration related to a non-violent drug arrest. I am not disclosing the police department which supervises the CS, to protect the identity of the CS. The CS has provided information regarding additional targets that law enforcement has investigated and independently corroborated. Therefore, investigators find the CS credible and believe information provided by the CS to be reliable. The CS's criminal history is limited to a 2023 narcotics arrest.

of a mixture and substance containing suspected fentanyl, in exchange for $1,130 in U.S. currency. Phone calls and text messages organizing this deal were recorded and preserved. Investigators captured the transaction with audio and visual recording equipment.

*On April 2, 2026, Co-Conspirator 1 Organized a Fentanyl Transaction with UC; [redacted] Retrieved Suspected Fentanyl from MEDINA ABREU and Delivered the Suspected Fentanyl to the UC.*

15. On Thursday, April 2, 2026, over recorded and preserved text messages, in lightly coded language, Co-Conspirator 1 and the UC agreed to complete a transaction for 1,000 suspected fentanyl pills in exchange for $2,250 in U.S. currency. To complete the transaction, Co-Conspirator 1 directed the UC to meet his associate at 141 South Union Street in Lawrence, Massachusetts. Prior to the deal, investigators met with the UC and provided him with an audio and video recording device and currency to purchase the narcotics.

16. At 10:45 a.m., investigators set up surveillance in the vicinity of 141 South Union Street where Co-Conspirator 1 told the UC to meet his associate. At 11:21 a.m., the UC called Co-Conspirator 1 and told him that he (the UC) had arrived at 141 South Union Street. Co-Conspirator 1 informed the UC that his associate would arrive in five minutes. Following the UC's arrival, investigators observed a Black 2011 Ford Escape bearing Massachusetts registration "6EAV93" ("Subject Vehicle 1") parked at this location. Prior to the suspected fentanyl transaction, the operator of Subject Vehicle 1, later identified as MEDINA ABREU exited his car and conversed with a man, later identified by investigators as [redacted] then entered and quickly exited Subject Vehicle 1. After exiting from Subject Vehicle 1, [redacted] approached the UC vehicle.

17. At approximately 11:30 a.m., as [redacted] approached the UC vehicle, Co-Conspirator 1 video called the UC and asked the UC to turn the camera so that Co-Conspirator

1 could identify his associate for the UC. Co-Conspirator 1 then identified the [redacted] who was approaching the UC vehicle.

18. [redacted] entered the UC vehicle through the front right passenger seat. [redacted] handed the UC a clear plastic knotted bag containing approximately 1,000 blue suspected fentanyl pills stamped with an "M" on one side and "30" on the other. These markings are consistent with pills meant to look like oxycodone pills. The UC handed [redacted] the currency to pay for the pills. This meeting was audio and video recorded.

19. At approximately 11:31 a.m., [redacted] exited the UC vehicle and returned to Subject Vehicle 1, where MEDINA ABREU had remained throughout this transaction. Investigators surveilling the area then observed a hand-to-hand transaction occur in Subject Vehicle 1 between [redacted] and MEDINA ABREU. Based on my training and experience, I believe that MEDINA ABREU brought suspected fentanyl pills to [redacted] who then entered the UC vehicle to sell the pills. [redacted] then exited the UC vehicle and went back inside Subject Vehicle 1, where he provided currency to MEDINA ABREU.

20. Investigators photographed the blue pills, which weighed approximately 123.3 grams. Investigators sent the suspected fentanyl to the laboratory for further testing, and the laboratory confirmed that the blue pills contained fentanyl.

*On April 9, 2026, Co-Conspirator 1 Organized a Fentanyl Transaction with UC; [redacted] Retrieved Suspected Fentanyl from Subject Vehicle 1 and Delivered the Suspected Fentanyl to the UC.*

21. On Thursday, April 9, 2026, at 10:56 a.m., in the presence of investigators, the UC exchanged series of preserved voice and text communications with Co-Conspirator 1 over WhatsApp, in which, in lightly coded language, Co-Conspirator 1 agreed to obtain fentanyl pills to sell to the UC. To conduct the transaction, Co-Conspirator 1 again directed the UC to 141 South

Union Street in Lawrence, Massachusetts. Anticipating that the deal would occur, starting at 10:00 a.m., investigators established surveillance in this area. Prior to the deal, investigators met with the UC and provided him with an audio and video recording device and currency to purchase the narcotics.

22. At 11:56 a.m., investigators observed [redacted] loitering near 141 South Union Street. At 12:01 p.m., the UC arrived in the vicinity of the meeting location. Between approximately 12:11 p.m. and 12:43 p.m., Co-Conspirator 1 and the UC continued to communicate about the transaction.

23. At 12:46 p.m., Subject Vehicle 1 arrived and parked near 141 South Union Street. At 12:49 p.m., Co-Conspirator 1 called the UC and confirmed that [redacted] had arrived. Investigators then observed [redacted] exit a barber shop near the meeting location and enter Subject Vehicle 1. Investigators could not identify the driver of Subject Vehicle 1. [redacted] then exited Subject Vehicle 1 and re-entered the barbershop. At 12:50 p.m., [redacted] exited the barbershop and entered the UC vehicle. Co-Conspirator 1 then called the UC to confirm that the deal could proceed. The UC provided [redacted] with $3,375 in U.S. currency and [redacted] handed the UC 1,500 blue pills inside of a clear knotted plastic bag. This meeting was audio and video recorded.

24. At 12:52 p.m., [redacted] exited the UC vehicle. At 12:53 p.m., investigators observed [redacted] enter and quickly exit Subject Vehicle 1. Subject Vehicle 1 then promptly exited the area. [redacted] returned to the barber shop. Based on my training and experience, I believe that the unknown target operating Subject Vehicle 1 (the Carrier for this transaction) brought suspected fentanyl pills to [redacted] who then

entered the UC vehicle to sell the pills. [redacted] then exited the UC vehicle and went back inside Subject Vehicle 1, where he provided currency to the unknown target.

25. Investigators photographed the blue pills, which weighed approximately 188 grams. Investigators sent the suspected fentanyl to the laboratory for further testing, and the results are pending. Based on the conversations between UC and Co-Conspirator 1 described above, the color and appearance of the pills stamped with an "M" and a "30", the prior confirmed fentanyl from the April 2, 2026, transaction, and my training and experience, I believe the blue pills wrapped in the plastic knotted bag contain fentanyl.

*On May 14, 2026, Co-Conspirator 1 Organized a Fentanyl Transaction with UC; MEDINA ABREU Drove from the Target Location Building and Delivered the Suspected Fentanyl to the UC; MEDINA ABREU Then Returned to the Target Location Building with the Drug Proceeds.*

26. On Wednesday, May 13, 2026, over preserved messages, the UC contacted Co-Conspirator 1. On Thursday, May 14, 2026, at approximately 11:29 a.m., the UC exchanged a series of preserved voice and text communications with Co-Conspirator 1 over WhatsApp, in which, in lightly coded language, Co-Conspirator 1 agreed to obtain 500 fentanyl pills to sell to the UC for $1,125. To conduct the transaction, Co-Conspirator 1 again directed the UC to 141 South Union Street in Lawrence, Massachusetts.

27. Anticipating that the deal would occur, starting at 11:00 a.m., investigators established surveillance outside of 909 Manor Road in Beverly, Massachusetts, where Subject Vehicle 1 was parked, according to the court authorized GPS which had been placed on vehicle following the April 9, 2026, transaction. At 12:00 p.m., investigations observed Subject Vehicle 1 travel to a Mobil Gas Station at 44 Dodge Street in Beverly. At that time, investigators identified

MEDINA ABREU and observed him refuel his vehicle. At that time, MEDINA ABREU wore a green sweatshirt and bright red sweatpants.

28. Investigators then followed MEDINA ABREU to 322 Hilldale Avenue in Haverhill, Massachusetts. At this address, MEDINA ABREU appeared to check the mailbox and entered the residence. When he exited, MEDINA ABREU appeared to place a key inside of the mailbox and now wore a green hooded sweatshirt, black pants and white sneakers.

29. At approximately 1:27 p.m., Co-Conspirator 1 sent a voice memo to the UC, from Co-Conspirator 1's associate, who investigators believed to be MEDINA ABREU. In the preserved message, MEDINA ABREU noted that he was waiting for someone to respond to him. That afternoon, investigators learned the MEDINA ABREU had a state court motion hearing at 2:00 p.m. in Woburn Superior Court. At approximately 1:45 p.m., investigators observed a vacant Subject Vehicle 1 in the parking lot of 200 Trade Center Drive, the address of the Woburn Superior Court.[3]

30. At approximately 4:23 p.m., investigators observed MEDINA ABREU drive to Route 95 Northbound from Woburn. At 4:32 p.m., Co-Conspirator 1 sent the UC a video on WhatsApp from an associate (believed to be MEDINA ABREU), showing the individual stuck in traffic in a black vehicle (believed to be Subject Vehicle 1), on what appeared to be an interstate highway. At approximately 5:04 p.m., the UC arrived at 127 South Union Street in Lawrence, Massachusetts. At approximately 5:25 p.m., Co-Conspirator 1 informed the UC that his associate would be arriving in about ten minutes. At approximately 5:28 p.m., investigators observed MEDINA ABREU park for a few minutes and then drive away from the area outside of 202 High

---

[3] See *Commonwealth v. Medina Abreu*, (2581CR00328). The docket confirms that ABREU had an evidentiary suppression hearing at 2:00 p.m. on May 14, 2026, at 2:00 p.m. The charges involve two counts of fentanyl trafficking and cocaine distribution.

Street in Lawrence (the "Target Location Building"). Investigators were not able to see if MEDINA ABREU entered the building. At approximately 5:38 p.m., MEDINA ABREU arrived and parked in front of 141 South Union Street. MEDINA ABREU then entered the right passenger side of the UC vehicle. Once in the UC vehicle, MEDINA ABREU greeted the UC, then looked at the UC's phone, and threw it into the backseat of the vehicle. Based on experience and training, investigators believe that MEDINA ABREU threw the UC's phone in the backseat to thwart any attempt at recording the transaction.

31. On an audio recording device in the UC vehicle, MEDINA ABREU can be heard telling the UC that Co-Conspirator 1 had called him that morning while he was sleeping and that he also had to go to court at 2:00 p.m. MEDINA ABREU also stated that the last few times the UC had been to South Union Street, Co-Conspirator 1 had called him the day before, to have the product ready. Thus, investigators believed that MEDINA ABREU had been present, inside of Subject Vehicle 1, at the last two transactions.

32. At that time, the UC then provided MEDINA ABREU with $1,250 and MEDINA ABREU gave him approximately 500 blue pills inside of a green plastic wrapped package. Directly following the deal, investigators observed MEDINA ABREU travel to the Target Location Building. He parked his car in front of the Target Location Building. At approximately 6:06 p.m., MEDINA ABREU exited the right-side door of the Target Location Building which is labeled as "202." Based on experience and training, MEDINA ABREU's travel before and after the transaction, and MEDINA ABREU's statements to the UC, investigators believe that MEDINA ABREU picked up the suspected fentanyl from the Target Location and then transported the suspected fentanyl to the transaction with the UC. Investigators further believe that MEDINA ABREU then dropped off the

drug proceeds at the Target Location following the transaction. Investigators further believe that the DTO uses the Target Location to store drugs and drug proceeds.

33. Following this transaction, investigators photographed the blue pills, which weighed approximately 58 grams. Investigators sent the suspected fentanyl to the laboratory for further testing, and the results are pending. Based on the conversations between UC, Co-Conspirator 1 and MEDINA ABREU described above, the color and appearance of the pills stamped with an "M" and a "30", the prior confirmed fentanyl from the April 2, 2026, transaction, and my training and experience, I believe the blue pills wrapped in the green plastic contain fentanyl.

*On June 24, 2026, Co-Conspirator 1 Organized a Fentanyl Transaction with UC; [redacted] Retrieved Suspected Fentanyl from DIAZ-MOURE and Delivered the Suspected Fentanyl to the UC.*

34. On Wednesday, June 24, 2026, over preserved messages, the UC contacted Co-Conspirator 1 on WhatsApp to purchase 1,000 fentanyl pills for $2,000. Co-Conspirator 1 confirmed that the deal could take place that afternoon near 141 South Union Street in Lawrence.

35. At approximately 11:30 a.m., investigators set up surveillance outside the Target Location Building. At approximately 12:22 p.m., investigators observed a male with a white t-shirt, jeans, black beard, and a hat exit the right-side door of the Target Location Building carrying a black plastic bag. The male then entered the rear seat of a Taxi and left the area. Investigators later confirmed this individual to be DIAZ-MOURE, as described below.

36. Approximately 12:35 p.m., the UC vehicle parked near 141 South Union Street. At 12:51 p.m., Co-Conspirator 1 communicated with the UC via WhatsApp and said that his associate should arrive soon. At approximately 1:00 p.m., investigators observed [redacted] walk towards the UC vehicle, enter the front right passenger door, and hand the UC approximately 1,000

blue pills. In exchange, the UC handed [redacted] $2,000. [redacted] then exited the UC vehicle with the drug proceeds.

37. At approximately 1:01 p.m., [redacted] walked to a car on nearby Bailey Street and entered the front right side passenger door of a 2013 Brown Honda CRV with Massachusetts registration 4HDS96 ("Subject Vehicle 2"). The vehicle is registered to Co-Conspirator 2 at the Target Location. [redacted] then exited Subject Vehicle 2. Following this interaction with [redacted] Subject Vehicle 2 departed from the area.[4] Based on experience and training, investigators believe that [redacted] handed the operator of Subject Vehicle 2 the proceeds from the drug transaction with the UC.

38. Investigators followed Subject Vehicle 2, which ultimately parked in the area of 49 Berkely Street. The operator exited the vehicle and investigators confirmed that the man operating Subject Vehicle 2 was the same man they had seen exiting the Target Location Building that morning carrying a black bag and entering a taxi. Investigators later confirmed this individual to be DIAZ-MOURE by comparing a photograph from DIAZ-MOURE's driver's license with their observations of DIAZ-MOURE, described above. Based on experience and training, the *modus operandi* for this DTO, the fact that DIAZ-MOURE carried a black plastic bag out of the Target Location Building, and the fact that [redacted] provided the suspected fentanyl pills to the UC, investigators believe that DIAZ-MOURE removed the suspected fentanyl from the Target Location and eventually provided it to [redacted] for sale to the UC.

[4] Investigators believe they have identified Co-Conspirator 2. I am withholding her name from this affidavit because she is not being charged in the requested criminal complaint.

39. At 1:28 p.m., DIAZ-MOURE entered a Western Union store located at 269 Jackson Street in Lawrence, Massachusetts. Investigators then observed DIAZ-MOURE speaking with an employee at the counter inside of the Western Union. Investigators later issued an administrative subpoena to Western Union and learned that at 1:35 p.m., on this date, from 269 Jackson Street, an individual sent a wire transfer in the name of Co-Conspirator 2, using the phone number 978-885-3392. The wire transfer was for $300. Investigators then reviewed all transactions utilizing this phone number. All of the transactions listed Co-Conspirator 2 as the sender, with the Target Location as the customer address. Thus, based on their observations, investigators believe that on this occasion, DIAZ-MOURE used Co-Conspirator 2's identity to send the transfer. Based on experience and training and the proximity of this wire transfer to the drug transaction, investigators further believe that DIAZ-MOURE used Co-Conspirator 2's identity to transfer drug proceeds.

40. At 1:36 p.m., DIAZ-MOURE exited the Western Union and drove to various businesses before parking outside of the Target Location Building. At approximately 2:04 p.m., DIAZ-MOURE exited Subject Vehicle and entered the right-side door of the Target Location Building, which is numbered "202." Following this transaction, investigators requested utilities records for the Target Location from National Grid, which confirmed the customer as "Abraham Diaz." Based on their observations in this investigation, including DIAZ-MOURE entering and exiting the Target Location Building and specifically the door labeled "202," investigators believe "Abraham Diaz" is the same person as Abraham DIAZ-MOURE. In addition, the last four digits of the social security number listed for the National Grid utility records match the social security number of Abraham DIAZ-MOURE. Based on experience and training and the information described above, investigators believe the Target Location is DIAZ-MOURE's residence. Investigators further believe that because DIAZ-MOURE conducted a wire transfer of drug

proceeds, and the fact that there are additional wire transfers fitting the same profile, that DIAZ-MOURE likely stores records of these wire transfers at the Target Location.

41. Following this transaction, investigators photographed the blue pills, which weighed approximately 122 grams. Investigators sent the suspected fentanyl to the laboratory for further testing, and the laboratory confirmed that the blue pills contained fentanyl.

*On July 24, 2026, Co-Conspirator 1 Organized a Fentanyl Transaction with UC; DIAZ-MOURE Departed from the Target Location Building and Delivered the Suspected Fentanyl to the UC; DIAZ-MOURE Then Returned to the Target Location Building After Making One Stop.*

42. On Thursday, July 23, 2026, over preserved messages, the UC contacted Co-Conspirator 1 on WhatsApp to purchase 1,000 fentanyl pills for $2,000. Co-Conspirator 1 confirmed that the deal could take place that afternoon near 141 South Union Street in Lawrence. Immediately following this discussion with the UC, at 12:42 p.m., Co-Conspirator 1 contacted 351-204-8676 (the "8676 Number"), a number believe to be used by DIAZ-MOURE.[5] Throughout the day, Co-Conspirator 1 and DIAZ-MOURE were in contact with each other 33 times. Based on experience and training, and DIAZ-MOURE's involvement in the prior suspected fentanyl transaction, investigators believe that Co-Conspirator 1 and DIAZ-MOURE were discussing the upcoming drug transaction with the UC.

43. On July 24, 2026, at approximately 7:57 a.m., investigators observed DIAZ-MOURE exit the right-side door of the Target Location Building and put a child on a school bus. He then went back inside of the Target Location Building. At approximately 9:44 a.m., investigators watched

---

[5] For instance, investigators have found that DIAZ-MOURE's Instagram profile includes this number as the number registered to the account.

Co-Conspirator 2 exit the right-side door of the Target Location Building and get into Subject Vehicle 2. She then drove to 274 Broadway Street in Lawrence.

44. At 10:24 a.m., the UC arrived in front of 127 South Union Street in Lawrence. At 10:26 a.m., Co-Conspirator 1 told the UC over preserved WhatsApp messages, that his local supplier should be arriving in seven minutes. At 10:30 a.m., investigators positioned outside of the Target Location Building watched DIAZ-MOURE get into an Uber. The Uber traveled from the Target Location Building to 274 Broadway Street, where Co-Conspirator 2 had parked Subject Vehicle 2. DIAZ-MOURE then drove Subject Vehicle 2 to 127 South Union Street in Lawrence. At approximately 10:58 a.m., DIAZ-MOURE exited Subject Vehicle 2 and entered the UC vehicle, exchanging 1,000 blue pills for $2,000. DIAZ-MOURE then exited the UC vehicle and entered the barbershop located at 141 South Union Street.

45. At approximately 11:00 a.m., immediately following this drug transaction, toll records show that the 8676 Number, used by DIAZ-MOURE, received an incoming call from Co-Conspirator 1 which lasted four minutes. Based on experience and training, investigators believe that DIAZ-MOURE confirmed the completed drug transaction with Co-Conspirator 1.

46. At approximately 11:08 a.m., DIAZ-MOURE departed from the barbershop and Lawrence Police Department pulled him over for a burnt-out right-side taillight. During this stop, DIAZ-MOURE identified himself to officers.

47. At approximately 11:21 a.m., investigators observed DIAZ-MOURE travel to 250 Merrimack Street in Lawrence. There, an unknown male exited a black SUV and entered the driver's seat of Subject Vehicle 2. DIAZ-MOURE then entered the passenger seat. Subject Vehicle 2 then traveled from 250 Merrimack Street to the Target Location Building, where DIAZ-MOURE exited

Subject Vehicle 2 and entered the right-side door of the Target Location Building. The unknown male then drove Subject Vehicle 2 back to 274 Broadway in Lawrence.

48. Based on experience and training, and DIAZ-MOURE's travel before and after the transaction, investigators believe that DIAZ-MOURE removed the suspected fentanyl from the Target Location and then transported the suspected fentanyl to the transaction with the UC. Investigators further believe that DIAZ-MOURE then returned to the Target Location with the drug proceeds. Investigators further believe that the DTO uses the Target Location to store drugs and drug proceeds.

49. Following this transaction, investigators photographed the blue pills, which weighed approximately 122 grams. Investigators sent the suspected fentanyl to the laboratory for further testing, and the results are pending. Based on the conversations between UC, Co-Conspirator 1 and DIAZ-MOURE described above, the color and appearance of the pills stamped with an "M" and a "30," the prior confirmed fentanyl from the April 2, 2026, and June 24, 2026, transactions, and my training and experience, I believe the blue pills wrapped in the green plastic contain fentanyl.

*On September 2, 2026, Co-Conspirator 1 Organized a Fentanyl Transaction with UC; FNU LNU 1 Delivered the Suspected Fentanyl to the UC.*

50. On September 2, 2026, Co-Conspirator 1 contacted the UC to arrange a fentanyl transaction. In loosely coded language over preserved WhatsApp messages, the parties agreed to exchange $2,000 for 1,000 fentanyl pills. The parties also agreed to conduct the transaction at 108 Water Street in Lawrence. According to toll analysis, at 9:07 a.m. on the morning of September 2, 2026, Co-Conspirator 1 contacted the 8676 Number, used by DIAZ-MOURE, twice. Based on experience and training, investigators believe that Co-Conspirator 1 discussed the upcoming fentanyl deal with DIAZ-MOURE.

51. At approximately 11:00 a.m., the UC arrived at 136 Water Street. At 11:16 a.m., an individual, FNU LNU 1, crossed Water Street and entered the front passenger side door of the UC vehicle.[6] Once inside the UC vehicle, FNU LNU 1, gave the UC approximately 1,000 blue pills in exchange for $2,000. FNU LNU 1 then departed from the area.

52. At approximately11:30 a.m., the UC told Co-Conspirator 1 that he does not want to meet new associates, and that if they set up another deal for 3,000 pills, it should be DIAZ-MOURE who delivers the drugs. Co-Conspirator 1 then stated, in loosely coded language, that FNU LNU 1 is the cousin of the individual who delivered the drugs last time (DIAZ-MOURE). Thus, investigators understood that FNU LNU 1 and DIAZ-MOURE were cousins. At 12:15 p.m., toll records show that the 8676 Number, used by DIAZ-MOURE, contacted Co-Conspirator 1. At 12:33 p.m., on a preserved WhatsApp text conversation, in loosely coded language, Co-Conspirator 1 confirmed that DIAZ-MOURE would deliver the drugs next time. Toll records then showed that between 12:15 p.m. and 5:32 p.m., Co-Conspirator 1 and the 8676 Number, used by DIAZ-MOURE, communicated 28 times. Based on experience and training, investigators believe that Co-Conspirator 1 discussed the upcoming fentanyl deal with DIAZ-MOURE.

53. Following this transaction, investigators photographed the blue pills, which weighed approximately 130 grams. Investigators sent the suspected fentanyl to the laboratory for further testing, and the results are pending. Based on the conversations between UC, Co-Conspirator 1 and FNU LNU 1 described above, the color and appearance of the pills stamped with an “M” and a “30,”

[6] Investigators believe they have identified FNU LNU 1. I am withholding his name from this affidavit because he is not being charged in the requested criminal complaint.

the prior confirmed fentanyl from the April 2, 2026, and June 24, 2026, transactions, and my training and experience, I believe the blue pills wrapped in the green plastic contain fentanyl.

*On September 8, 2026, Co-Conspirator 1 Shares an Image of Blue Pills for Sale.*

54. Between September 3, 2026, and September 4, 2026, Co-Conspirator 1 communicated with the 8676 Number, used by DIAZ-MOURE, 48 times. In particular, on September 4, 2026, between approximately 6:42 a.m. to 10:25 a.m., Co-Conspirator 1 and the 8676 Number, used by DIAZ-MOURE communicated 30 times. At 11:11 a.m., Co-Conspirator 1 contacted the UC and said that he would have another order ready for September 7, 2026, and in loosely coded language, said that they would be the same drugs as last time.

55. On September 7, 2026, the UC, over preserved messages, texted Co-Conspirator 1 on WhatsApp. At approximately 4:10 p.m., Co-Conspirator 1 stated, in loosely coded language, that the "same guy" would have an order of 3,000 fentanyl pills ready for sale on September 10, 2026. Then, from 5:41 p.m. to 8:49 p.m., Co-Conspirator 1 communicated with the 8676 Number, used by DIAZ-MOURE, nine times. On September 8, 2026, at approximately 11:21 a.m., Co-Conspirator 1 shared an image with the UC containing what appeared to be two clear plastic bags of blue pills. In loosely coded language, Co-Conspirator 1 confirmed that these would be from the same guy, who investigators understood to be DIAZ-MOURE. Based on experience and training, investigators believe DIAZ-MOURE will likely deliver fentanyl pills to the UC on or about September 10, 2026, and is storing those narcotics and paraphernalia related to those narcotics in the Target Location.



56. Based on experience and training, investigators believe that DIAZ-MOURE continues to be an active member of this DTO. Investigators further believe that DIAZ-MOURE stores drugs, drug proceeds, and records of drug transaction at his residence – the Target Location.

*DIAZ-MOURE's Purchase of Pill Manufacturing Excipients and Communications with Pill Manufacturing Entities; On August 10, 2026, Co-Conspirator 1 Shares an Image of Multi-Colored Pills for Sale.*

57. On June 18, 2026, and on June 22, 2026, investigators learned that a purchaser using the name of Co-Conspirator 2, placed a large order for pill manufacturing excipients with a "sell to address" and a "bill to address" of the Target Location Building. For these orders, the purchaser used a "sell to email" and a "bill to contact email" of "abraham.diazm92@gmail.com" which investigators believe is used by DIAZ-MOURE based on the first and last name of the email address. In addition, the "sell to phone no [*sic*]" is the 8767 Number, used by DIAZ-MOURE. These orders include large quantities of Firmapress, a material used in pill manufacturing as a tablet binder, filler, and lubricant.

58. These orders also included different colors of Firmapress to make different color pills. For instance, this order included five kilograms of blue Firmapress, two kilograms of orange Firmapress, one kilogram of white Firmapress, one kilogram of red Firmapress, one kilogram of green Firmapress, one kilogram of pink Firmapress, and one kilogram of yellow Firmapress. These various colors appear to align with the different color pills Co-Conspirator 1 has said are available for the UC to purchase.

59. On August 10, 2026, in a preserved WhatsApp message included below Co-Conspirator 1 shared images of various colored pills for sale.




60. In addition, the order included a kilogram of magnesium stearate, a powder used to make tablets or pills. These materials were shipped to 263 Walter Street, Apartment 3, in Lawrence. However, based on the contact information provided by the purchaser, and that drug traffickers often send packages to addresses other than their own to avoid detection, investigators believe this delivery was ultimately retrieved by either Co-Conspirator 2 or DIAZ-MOURE.

61. Through toll analysis of the 8676 Number, investigators have learned that DIAZ-MOURE is also in contact with two Chinese contacts known to sell pill manufacturing equipment and pill dies. For instance, as of August 8, 2026, DIAZ-MOURE had been in contact with Zhuzhou Good Cemented Carbide Co. Ltd. 152 times, a Chinese company known for selling tableting supplies. Also, DIAZ-MOURE, using the 8676 Number, has contacted Shanghai Tianhe Machinery Equipment 100 times, a Chinese company known to sell illicit machinery such as pill presses.

62. Based on experience and training, the use of the Target Location to purchase and likely receive pill binder material, the travel of DIAZ-MOURE and others to and from the Target Location Building before and after drug transactions, and the fact that the Target Location is DIAZ-MOURE's residence, investigators believe that DIAZ-MOURE likely stores drugs, drug proceeds, drug manufacturing equipment, records of financial transactions involving drug proceeds, and other indicia of drug trafficking at the Target Location.

*Drug Traffickers' Use of Residences and Cell Phones Generally*

63. Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

a. Controlled substances.

b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or

associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g. Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h. Items of personal property that tend to identify the person in residence, occupancy, control, or ownership of the Target Location. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j. Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

35. Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs,

paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences.

36. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

37. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice

for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

38. Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

39. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

40. Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused in their residence for future use. Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

41. During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Charged Offense and investigation of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drugs is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

42. Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other co-conspirators. As described above, the Target Subjects and the UC used cellular telephones to communicate with each other to arrange drug purchases and money payments. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement’s use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement’s use of electronic surveillance. Because cellular telephones

are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

43. Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

44. Seizure of devices containing this information will provide information relating to co-conspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular

telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

45. Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

46. Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

*Unlocking a Device Using Biometric Features*

47. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices,

particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

48. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

49. If a device is equipped with a facial-recognition feature, as many Android, Apple, and other devices are, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face. Similar technology allows users to unlock a device specifically through iris recognition.

50. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to

unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

51. As discussed in this affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under these warrants currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by these warrants.

52. I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances, even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when a certain period of time has elapsed since the device was last unlocked and/or when the device has not been unlocked using a fingerprint and the passcode or password has not been entered in a certain period of time. Similarly, certain Android devices cannot be unlocked with Trusted Face or fingerprint access if the device has remained inactive for a certain number of hours. Other Android and Apple biometric features, and similar features from other brands, carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

53. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose biometric features are among those that will unlock the device(s), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require the Target Subjects to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

54. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to these warrants and may be unlocked using one of the aforementioned biometric features, these warrants permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of DIAZ-MOURE to the fingerprint scanner of the devices found at the Target Location; (2) hold the devices found at the Target Location in front of DIAZ-MOURE's face and activate the facial recognition feature; and/or (3) hold the devices found at the Target Location in front of the face of DIAZ-MOURE and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by these warrants. The proposed warrants do not authorize law enforcement to compel that DIAZ-MOURE state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrants do not authorize law enforcement to compel DIAZ-MOURE to identify the specific biometric characteristics (including the unique finger(s) or other

physical features) that may be used to unlock or access the devices. I understand that if DIAZ-MOURE refuses to cooperate, the matter must be resolved through contempt proceedings rather than through the application of unreasonable physical force.

55. I further request that the Court authorize law enforcement to change device settings on any seized device(s) to disable "Stolen Device Protection," which is a security measure that can be used to prevent unauthorized access to the device and data. When enabled, however, this feature might prevent forensic tools from being able to extract data from devices.

## CONCLUSION

56. Based on the information described above, I have probable cause to believe that that Target Subjects committed the Charged Offense.

57. Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B, will be found in the Target Location, described in Attachment A.

Respectfully submitted,

*Rafael Duran (JDH)*
Rafael Duran, Task Force Officer
Drug Enforcement Administration

Sworn via telephone in accordance with Fed R. Crim. P. 4.1 on September 9, 2026

Honorable Jessica D. Hedges
United States Magistrate Judge

# ATTACHMENT A-1

## PROPERTY TO BE SEARCHED

The premises to be searched is 202 High Street, Apartment 3, Lawrence, Massachusetts, 01841. The property is a three-family dwelling with light green and beige siding. The triple decker building contains two front doors. The entrance to 202 High Street is accessible through the right-side entrance. The number "202" is clearly marked on the door of the right-side entrance. Pictures of the property are included below:




202
200

**<u>ATTACHMENT A-2</u>**
**DESCRIPTION OF PERSON TO BE SEARCHED**

The person to be searched is Abraham DIAZ-MOURE, YOB: 1992, and any computer equipment found on his person.

Photographs of DIAZ-MOURE follow:





## ATTACHMENT B

## ITEMS TO BE SEIZED

I. All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, including:

A. Records and tangible objects, regarding ownership and occupancy, pertaining to the following people, entities, physical addresses, telephone numbers:

1. Abraham DIAZ-MOURE;
2. 351-204-8676;
3. 202 High Street, Apartment 3, Lawrence, Massachusetts, 01841.

B. Illegal drugs, including fentanyl;

C. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices, and dilutants such as mannitol, mannite, and inositol;

D. Records and tangible objects pertaining to the payment, receipt, transfer, or storage of money or other things of value by any one of the names listed above, from the time period between March 2026, to the present, including, without limitation:

1. Bank, credit union, investment, money transfer, and other financial accounts;
2. Credit and debit card accounts;

3. Tax statements and returns;

4. Business or personal expenses;

5. Income, whether from wages or investments;

6. Loans;

E. Records and tangible objects pertaining to the travel or whereabouts of DIAZ-MOURE between March 2026, to the present;

F. Records and tangible objects from between March 2026, to the present pertaining to the existence, identity, and travel of any co-conspirators named in the affidavit, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

G. From March 2026, to the present, books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of drugs. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

H. From March 2026, to the present, personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

I. For any computer hardware, computer software, mobile phones, or storage media

called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

1. evidence of who used, owned, or controlled the computer equipment;
2. evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;
3. evidence of the attachment of other computer hardware or storage media;
4. evidence of counter-forensic programs and associated data that are designed to eliminate data;
5. evidence of when the computer equipment was used;
6. passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;
7. records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

J. Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

K. All computer hardware, computer software, and storage media reasonably believed to be related to DIAZ-MOURE. Off-site searching of these items shall be limited to searching for the items described in paragraph J and limited to the period of between March 2026 to the present.

L. During the execution of the search of the Target Location described in Attachment

A-1, or the search of DIAZ-MOURE, described in Attachment A-2, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using biometric features, this warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of DIAZ-MOURE to the fingerprint scanner of the devices found at the Target Location or on DIAZ-MOURE's person; (2) hold the devices found at the Target Location or on DIAZ-MOURE's person in front of the face of DIAZ-MOURE and activate the facial recognition feature; and/or (3) hold the devices found at the Target Location or on DIAZ-MOURE's person in front of the face of DIAZ-MOURE and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The warrant does not authorize law enforcement to compel that any person state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the warrant does not authorize law enforcement to compel any person to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices. This warrant does not authorize the use of unreasonable physical force to secure compliance with its authorizations.

M. Law enforcement personnel are authorized to change device settings on any seized device(s) to disable "Stolen Device Protection."

**DEFINITIONS**

For the purpose of this warrant:

1. "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

2. “Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).
3. "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.
4. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).
5. "Data" means all information stored on storage media of any form in any storage format and for any purpose.
6. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**RETURN OF SEIZED COMPUTER EQUIPMENT**

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

Law enforcement personnel is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant until the completion of its investigation or the completion of any trial, appeal, or collateral proceeding involving the records and data seized, after which time law enforcement personnel will dispose of the account duplicate consistent with the agency's evidence disposal policy.